IN THE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MELINDA SMITH,

      **Plaintiff,**

v.                                  **Civil Case No. 1:19cv133**
                                      **(Judge Kleeh)**

UNITED STATES OF AMERICA,

      **Defendant.**

## REPORT AND RECOMMENDATION

On April 15, 2019, the *pro se* Plaintiff, an inmate then-incarcerated at FPC Alderson[1] in Alderson, West Virginia, filed a "Request for Extension to Time to File Claim Under the Federal Tort Claims Act ("FTCA")" in the United States District Court for the Southern District of West Virginia, naming the Federal Bureau of Prisons ("BOP") as "respondent [sic]," and seeking a six-month extension of time in which to file her FTCA complaint. ECF No. 1. The "request" referenced BOP Administrative Tort Claim No. TRT-MXR-2018-05702 [id.] in the style of the case; it was construed as a letter form complaint seeking relief under the FTCA. See ECF No. 3.

By Order and Notice issued on April 22, 2019 in the Southern District of West Virginia, Plaintiff was directed to file an amended complaint, and to the extent she was asserting a FTCA claim, to name the United States as the defendant. Id. at 1. She was also advised to pay the filing fee or file an application to proceed as a pauper. Id. at 2 – 3. The Clerk of the Southern District of West Virginia was directed to send Plaintiff a copy of a form complaint and application to proceed as a pauper. Id. at 3. On May 24, 2019, Plaintiff filed her Amended Complaint on a Southern District of West Virginia's form "Complaint for a Civil Case," naming the United States as the

---

[1] Plaintiff was released from prison on or about August 5, 2020.

sole defendant. ECF No. 5. The Amended Complaint was unsigned. She also filed a Memorandum of Law in Support of Tort Claim. ECF No. 6.

Because the facts giving rise to the complaint appear to have occurred primarily at Hazelton Secure Female Facility ("HSFF"), in Bruceton Mills, West Virginia, by Order entered in the Southern District of West Virginia on July 1, 2019, the case was transferred to this Court; the transferral was completed on July 2, 2019.[2] ECF Nos. 10, 12. The Clerk of Court sent the Plaintiff a Notice of Deficient Pleading and Intent to Dismiss, enclosing this Court's form packet for filing a Bivens action. ECF No. 13.

Upon the undersigned's review of the record, it was unclear whether the Plaintiff was attempting to pursue a Bivens action, an FTCA action, or both. Accordingly, by Order entered July 3, 2019, the Clerk was directed to vacate the Notice of Deficient Pleading and Intent to Dismiss and to send Plaintiff a Court-approved FTCA packet; the Plaintiff was directed to clarify her claims and advised of the potential consequences of pursuing both a Bivens and a FTCA action.  ECF No. 14. Further, Plaintiff was directed to complete whichever form complaint was necessary to pursue which action(s) she chose, and if she wished to pursue both, she was directed to complete, sign, and return both the Bivens and FTCA complaints within 21 days of service of the Order.  Id. She was also directed to complete the motion to proceed as a pauper and its supporting documents and return those within the same time period. Id.

On July 18, 2019, Plaintiff moved for a 90-day extension of time in which to file her Bivens and FTCA complaints on the approved forms, referencing unspecified difficulties in researching her case at her place of incarceration [ECF No. 17]; by Order entered July 24, 2019, Plaintiff's

---

[2] Inexplicably, the Southern District of West Virginia docketed the case as a Bivens action and it was transferred accordingly.

motion was granted in part; she was given thirty days from the date of entry of the Order to file her form <u>Bivens</u> and FTCA complaints; copies of her Administrative Tort Claim; its acknowledgment and final denial letters; and her motion to proceed as a pauper with the supporting documents necessary to proceed *in forma pauperis* ("IFP"). ECF No. 18. Plaintiff was advised that no further extensions would be granted and warned that failure to comply within the allotted time would risk dismissal of her case. <u>Id.</u>

On September 3, 2019, Plaintiff filed her Second Amended FTCA complaint on the Court-approved form; a motion to proceed as a pauper; a Consent to Collect Fees from her Prisoner Trust Account; and a copy of her Prisoner Trust Account Report ("PTAR") without its ledger sheets. ECF Nos. 20, 21, 22, 23. By Order entered in error on September 5, 2019, Plaintiff's FTCA case was dismissed without prejudice for the failure to prosecute.[3] ECF No. 24. By Order entered September 10, 2019, the dismissal Order was vacated and the case was reopened. ECF No. 25. By separate Order entered the same day, Plaintiff was directed to correct her deficiencies. ECF No. 26. In a footnote in that Order, the undersigned noted that  because Plaintiff had not completed and returned the <u>Bivens</u> complaint, it was presumed that she intended to abandon her <u>Bivens</u> claims and proceed only on the FTCA claims. <u>Id.</u> Plaintiff was given 21 days from the date of entry of that Order to comply, and warned that failure to do so within the allotted time would result in dismissal of her case without prejudice. <u>Id.</u>

On September 13, 2019, Plaintiff moved for reconsideration of the Order dismissing the case. ECF No. 28. On September 18, 2019, Plaintiff filed a letter with the Court asserting that she had in fact returned copies of both a completed <u>Bivens</u> complaint and the FTCA complaint that was already docketed as her Second Amended FTCA Complaint. ECF No. 32. Plaintiff claimed

---

[3] The dismissal Order was entered inadvertently because Plaintiff's September 3, 2019 filings were not docketed until the next day.

that she was unaware that the Court had not received the Bivens complaint until she received a copy of the Court's September 10, 2019 Order, and asked the Court how to proceed. Id. at 1 - 2. By Order entered September 18, 2019, Plaintiff was directed to refile a copy of her Bivens complaint within 14 days of the date of entry of the Order, because the original had not been received by the Court. ECF No. 33.

On September 20, 2019, Plaintiff filed a copy of the ledger sheets to her PTAR. ECF No. 34. By Order entered September 24, 2019, Plaintiff was granted permission to proceed IFP but directed to pay an initial partial filing fee ("IPFF") within 28 days. ECF No. 35. On October 3, 2019, Plaintiff filed a response to the Order granting IFP that was construed as a motion to reconsider the previously assessed IPFF and denied by Order entered October 8, 2019. ECF Nos. 38, 41.  Plaintiff also filed a motion for legal mail to be opened in her presence; it was granted by Order entered October 8, 2019. ECF Nos. 39, 40. Plaintiff paid her IPFF on October 21, 2019.

On October 24, 2019, having still not received Plaintiff's Bivens complaint, another Order to Show Cause was entered, giving Plaintiff another 14 days in which to comply and warning that failure to do so would result in an Order dismissing her Bivens action without prejudice. ECF No. 45. On November 27, 2019, Plaintiff filed a response to the Show Cause Order, claiming to have filed a second copy of her Bivens complaint on October 15, 2019, and requesting an unspecified extension of time in which to try to mail a third copy. ECF No. 49.

Plaintiff's motion for reconsideration of the Order dismissing her case was denied as moot on March 4, 2020. A second Show Cause Order was entered the same day, noting that it had been over three months since Plaintiff had indicated she needed an extension of time to file a third copy of the Bivens complaint; Plaintiff was advised that she had 14 days from the date of entry of that Order in which to file to file the Bivens complaint and again warned that failure to comply would

result in a dismissal of the Bivens action without prejudice. ECF No. 54. Plaintiff was warned that no further extensions would be granted. Id.

On March 10, 2020, Plaintiff filed a response to the second Show Cause Order, recounting various difficulties in filing her Bivens complaint and her legal mail generally, and a motion requesting that the Court direct BOP officials to provide her with copies of her 2017 and 2018 administrative remedies. ECF Nos. 56, 57. Plaintiff also wrote a letter to the Clerk, requesting another Bivens form complaint; the requested form complaint was sent to her the same day. ECF No. 5. By Order entered March 11, 2020, Plaintiff's motion requesting the Court direct BOP officials to provide her with copies of her administrative remedies was denied without prejudice as premature. ECF No. 59.

By Order entered April 14, 2020, the Bivens action was dismissed without prejudice for the failure to prosecute. ECF No. 63. The Clerk of Court was directed to change the nature of suit and cause of action to reflect that the Second Amended Complaint arises under the FTCA. Id.

On April 22, 2020, the United States was directed to answer the Second Amended Complaint. ECF No. 64. On April 23, 2020, Plaintiff moved for reconsideration of the April 14, 2020 Dismissal Order. ECF No. 67. On June 9, 2020, Plaintiff filed an Emergency Motion requesting that her outside medical records be subpoenaed. ECF No. 77. By Order entered June 11, 2020, the motion was construed as a motion for discovery and denied as premature. ECF No. 78.

On June 18, 2020, the United States moved for an extension of time; by Order entered June 19, 2020, the motion was granted. ECF Nos. 79, 81. On July 20, 2020, the United States moved for a second extension of time; by Order entered July 27, 2020, the second extension was granted. ECF Nos. 84, 85.  On July 31, 2020, Plaintiff filed a Motion for Suspension of Filing Fee or Waiver

of the Balance Due to Early Release/Reduction in Sentence; the same day, the United States filed a response in opposition; by Order entered August 4, 2020, the motion was denied. ECF Nos. 87, 89, 90.

On August 26, 2020, the United States filed a Motion to Dismiss or for Summary Judgment with a memorandum in support, along with a motion to file copies of certain records under seal. ECF Nos. 94, 95, 96. Because Plaintiff was proceeding *pro se*, on September 1, 2020, a Roseboro Notice was issued. ECF No. 97. By separate Order entered the same day, the Government's motion to seal was granted. ECF No. 98. On September 22, 2020, Plaintiff moved for a thirty-day extension of time to obtain copies of her medical records from outside providers. ECF No. 101. By Order entered September 28, 2020, Plaintiff's motion for an extension of time was granted in part as to the extension of time in which to file her response, but denied in part as to her request to produce copies of records from outside medical providers. ECF No. 102. Plaintiff was specifically directed not to produce records of outside providers, given that until such time as the Court had determined whether any genuine issue of material fact existed, such discovery was premature. Id. On October 23, 2020, Plaintiff filed her response in opposition to the Government's dispositive motion, attaching 93 pages of medical records from outside providers. ECF No. 104.

Accordingly, this case is before the undersigned for review and report and recommendation, pursuant to LR PL P 2.

## I. Factual and Procedural History

### A. Plaintiff's Uncontested Medical History

Plaintiff was incarcerated at the HSFF from April 15, 2016 through January 15, 2019. See Inmate History, ECF No. 95-1. On April 19, 2016, HSFF medical staff evaluated Smith on April 19, 2016. Mims Decl., ECF No. 96-2, ¶ 8 at 3. Smith reported that she had hyperthyroidism and

was taking metoprolol due to the heart palpitations. Id. Medical staff ordered labs and planned to continue the existing course of treatment. Id. Smith also reported that she had cystocele, a dropped or prolapsed bladder. Id. She indicated that she was scheduled to have surgery before being incarcerated. Id. Medical staff requested a gynecology consultation for Smith. Mims Decl, ¶ 8.

On May 5, 2016, HSFF medical staff evaluated Smith and reviewed thyroid lab test results with her. Mims Decl., ¶ 9.  Smith indicated that she was not taking the prescribed metoprolol because she did not like its side effects. Id. Specifically, Smith reported heart palpitations and leg tremors. Id. Medical staff prescribed methimazole instead. Id. at ¶ 9.  On July 1, 2016, SFF Hazelton medical staff again evaluated the hyperthyroidism condition treatment plan with Smith. Mims Decl. at ¶ 10. Smith reported that she was still experiencing restless, shaky legs and swelling. Id. Medical staff suggested adding atenolol to help with the hyperthyroidism side effects; Smith was agreeable with the treatment plan. Id.

HSFF staff arranged for a gynecology specialist to evaluate Smith and tested her for lesions, malignancy, and human papillomavirus. Exhibit 2, Mims Decl. at ¶¶ 11-12. The gynecology specialist, Dr. James Holehouse, evaluated Smith and recommended a repair of her previous hysterectomy using a sling urethropexy. Mims Decl. at ¶ 12.

On October 17, 2016, HSFF medical staff evaluated Smith again and discussed the hyperthyroidism. Mims Decl. at ¶ 13. Smith indicated that she had quit taking the methimazole medication when she started taking the propranolol medication. Id. She reported that she felt better just taking the propranolol. Id. Medical staff indicated that Smith was pending approval and scheduling to see an endocrinology specialist. Id. Medical staff reviewed thyroid lab test results with Smith. Id. Medical staff renewed the propranolol prescription. Id.

On January 13, 2017, SFF Hazelton medical staff evaluated Smith again regarding hypothyroidism. Mims Decl., ¶ 14.

On February 20, 2017, gynecology specialist Dr. Holehouse performed a colporrhaphy and sling urethropexy to address Smith's vaginal prolapse and urinary incontinence. Mims Decl., ¶ 15. HSFF medical staff monitored Smith after the operations.  Mims Decl., ¶ 16-17. On February 24, 2017, HSFF medical staff conducted a postoperative evaluation; Smith denied pain and reported that she was doing better. Id. Medical staff provided Tylenol and told Smith to follow up as needed and to notify medical staff if she experienced worsening pain or signs of infection. Id. On March 3, 2017, Smith reported she was still bleeding, but denied pain. Mims Decl., ¶ 18.  Dr. Hollingsworth completed a vaginal exam and noted that the sutures from the operations were intact, but also detected an odor that indicated the possibility of infection. Id. Medical staff prescribed two antibiotics, witch hazel, and glycerin pads for cellulitis. Id. BOP staff also requested a follow up appointment with gynecology specialist Dr. James Holehouse. Id.

On March 14, 2017, HSFF medical staff again evaluated Smith. Mims Decl., ¶ 20.  Medical staff continued medication and evaluation for hyperthyroidism. Id. Medical staff requested that Smith see an endocrinology specialist. Id. With respect to the vaginal surgery follow up, Smith reported that she felt better overall; the odor was gone; and that she was experiencing no signs or symptoms of infection. Id.

HSFF medical staff continued to evaluate Smith after the surgery. Mims Decl., ¶¶ 21-24. Smith had bladder leakage and hemorrhoids. Id. HSFF medical staff scheduled a gynecology consultation. Id.

On June 13, 2017, gynecology specialist Dr. Omar Duenas evaluated Smith. Mims Decl., ¶ 25. Smith had pelvic pain, prolapse, leakage, and hemorrhoids. Id. Dr. Duenas made several

recommendations with respect to Smith's pelvic complaints, including reviewing various treatment options, and recommended that a colorectal surgeon evaluate Smith's hemorrhoids. Id.

HSFF medical staff continued to monitor Smith's hyperthyroidism medication. Mims. Decl., ¶ 26. Gynecology specialist Dr. Duenas recommended a follow up cystoscopy. Id. at ¶ 27.

On July 11, 2017, HSFF medical staff evaluated Smith and adjusted her thyroid medication. Mims Decl., ¶ 28. Medical staff also requested various consultations, including endocrinology for hyperthyroidism, urology for cystourethroscopy, and general surgery for hemorrhoidectomy. Id.

On September 19, 2017, Smith was evaluated again by gynecology specialist Dr. Duenas. Mims Decl., ¶¶ 32-34. Duenas conducted various testing and analyses and presented various options to Smith. Id. Smith elected to proceed with another surgical procedure to correct the prolapse. Id. Dr. Duenas performed the surgery on November 28, 2017. Mims Decl., ¶¶ 35-38. HSFF medical staff monitored and evaluated Smith after the surgery.  Mims  Decl., ¶¶  36-42. Medical  staff  recommended that  Smith  see  an endocrinology specialist for her hyperthyroidism and either a general surgery or a colorectal surgery specialist for hemorrhoids. Mims Decl., ¶ 42.

On April 19, 2018, Dr. Duenas evaluated Smith again. Mims Decl., ¶ 43. Smith reported that she felt well, the prolapse was gone, and she had no pressure-like symptoms. Id. Dr. Duenas referred Smith to a colorectal specialist for further evaluation regarding constipation and irritation. Id.

On May 1, 2018, endocrinology specialist Dr. Jessica Perini evaluated Smith regarding hyperthyroidism. Mims Decl., ¶ 44. Dr.  Perini  noted that  Smith  did not  comply with prescribed medications.  Id.  Dr.  Perini requested  lab tests  and an  ultrasound  to further  evaluate the hyperthyroidism. Id. HSFF staff requested the ultrasound. Mims Decl., ¶ 45.

Plaintiff was seen by Dr. John Nguyen, an ophthalmology specialist at WVU's Ophthalmology-Eye Institution for Grave's Disease, but was diagnosed with suspected glaucoma, and follow up was recommended. Mims Decl., ¶ 46.

On July 26, 2018, colorectal specialist Dr. Nezar Jrebi evaluated Smith and recommended a colonoscopy and an MRI. Mims Decl. at ¶ 48.

On October 5, 2018, an ophthalmology specialist again evaluated Smith. Mims Decl., ¶ 49 The specialist recommended that Smith be monitored and evaluated again in six months. Id.

On October 10, 2018, Smith was again evaluated by an endocrinology specialist. Mims Decl., ¶ 50. The specialist recommended that Smith continue her thyroid medication and follow up in four months. Id. The specialist also reviewed an ultrasound of Smith's thyroid and recommended that she have another ultrasound in a year. Id.

On October 19, 2018, Smith had a colonoscopy at Ruby Memorial Hospital. Mims Decl., ¶ 51. The colonoscopy was normal but did show internal hemorrhoids. Id. It was recommended that Smith continue to be monitored and have another colonoscopy in ten years. Id.

On November 27, 2018, Smith refused thyroid lab tests to evaluate her hyperthyroidism and develop a hyperthyroidism treatment plan. Mims Decl., ¶ 52.

Smith continued to receive ongoing medical treatment at HSFF Hazelton until she left on January 15, 2019. Mims Decl. at ¶ 53; see also Inmate History, ECF No. 95-1 at 1.

**B. Second Amended Complaint**

In her Second Amended FTCA Complaint, the plaintiff raises 5 separate medical malpractice claims, alleging that the Bureau of Prisons has ignored various medical and surgical issues related to a vaginal prolapse, hemorrhoids, failure to provide appropriate pre- or post-operative care; failure to refer her to the appropriate surgeon(s) to treat her problems; failure to

timely provide endocrinology treatment for her hyperthyroidism, and generally delayed treatment for all of her medical problems. ECF No. 20 at 6 – 9.

Plaintiff contends that as a result of the Defendant's employees' actions, she has suffered four years of "extreme harm and pain" and has had to have additional surgery as a result of the BOP's negligence. Id. at 9.

Plaintiff asserts that she filed an administrative tort claim on May 16, 2018, and the Claim Number assigned was TRT-MXR-018-05702, in which she requested $7,500,000.00 in damages for her injuries. Id. at 4; see also ECF No. 20-18.

As relief, she requests $5.5 million dollars for "actual/compensatory damages, and $2.5 million for punitive damages. ECF No. 20 at 9.

Plaintiff attaches a memorandum in support [ECF No. 20-1]; copies of certain medical records [ECF Nos. 20-2 - 20-16]; and a copy of her undated/unsigned Standard Form 95 [ECF No. 20-18]; a copy of her July 20, 2018 Administrative Tort Claim acknowledgement letter, assigning the number TRT-MXR-2018-05702 to her claim [ECF No. 20-17]; and a copy of her October 19, 2018 Administrative Tort Claim denial letter.

## C. **The Defendant's Motion to Dismiss or for Summary Judgment**

The defendant asserts that the Second Amended Complaint should be dismissed or summary judgment granted in its favor because Plaintiff filed suit without first filing the screening certificate of merit required by West Virginia medical negligence law, barring her claims of medical negligence and malpractice. ECF No. 95 at 12 – 15. Further, her claims are untimely, because she did not file suit within six months after the date of mailing of the final denial claim by the agency to which the claim was presented, because she initiated her FTCA action by filing a motion for an extension of time that contained no FTCA claims, facts, or argument; she did not

11

file an actual complaint in the Southern District of West Virginia until May 24, 2019, more than six months after the BOP denied her administrative claim. Id. at 15 – 16.  Moreover, even if Smith could pursue her claims, she cannot establish a negligence claim because she has not proved that any act or omission by a medical provider was the proximate cause of injury to her. Id. at 20 – 21. Finally, Smith cannot demand more money in this FTCA suit than she requested in her administrative tort claim. Id. at 21 – 22.

Attached to its dispositive motion, Defendant filed a memorandum of law in support [ECF No. 95]; copies of a sworn Declaration by Howard Williams, Legal Assistant and Administrative Remedy Clerk at the Mid-Atlantic Regional Office of the Federal Bureau of Prisons ("BOP") ("Williams Decl.") [ECF No. 95-1 at 2 - 3]; a copy of Smith's Public Information Inmate Data [id. at 5 – 8]; a copy of Smith's Inmate History [id. at 10 – 11]; a copy of Smith's May 1, 2018 signed Standard Form 95 [id. at 13 – 22]; copies of certain of Smith's medical records [id. at 23 – 39]; copies of certain TRULINCS emails between Smith and staff and copies of various administrative remedies filed by Smith with the responses thereto. Id. at 40 – 51. Defendant also produced a sworn Declaration of Gregory Mims, M.D., the Clinical Director at FCC Hazelton ("Mims Decl.") [ECF 96-2 at 2 – 13], along with copies of certain other of Plaintiff's medical records.  Id. at 14 – 711.

**D. <u>Plaintiff's Response in Opposition</u>**

The plaintiff reiterates the factual chronology of her various medical claims and some of her allegations regarding the Government's negligence regarding the same. ECF No. 104 at 1 – 15. She provides a 4-page summary of her pain and suffering. Id. at 16 - 21.  She asks that her case not be dismissed; that it be "presented to the Grand Jury;" and that the Court "mediate a fair settlement[.]" Id. at 23.

Plaintiff does not address the Government's arguments regarding her failure to comply with the West Virginia Medical Professional Liability Act ("MPLA"); the untimeliness of her claims; her failure to plead cognizable medical negligence claims; or her request for damages in excess of that requested in her Standard Form 95.

## II. <u>Standard of Review</u>

### A. <u>Motion to Dismiss, Fed.R.Civ.P.12(b)(1)</u>

A party may move to dismiss an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The burden of proving subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss is on the party asserting federal jurisdiction. <u>Adams v. Bain</u>, 697 F.2d 1213, 1219 (4th Cir. 1982).  A trial court may consider evidence by affidavit, deposition, or live testimony without converting the proceeding to one for summary judgment. <u>Id</u>.; <u>Mims v. Kemp</u>, 516 F.2d 21 (4th Cir. 1975). "Unlike the procedure in a 12(b)(6) motion where there is a presumption reserving the truth finding role to the ultimate factfinder, the court in a 12(b)(1) hearing weighs the evidence to determine its jurisdiction." <u>Adams</u>, 697 at 1219. Further, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. <u>Materson v. Stokes</u>, 166 F.R.D. 368, 371 (E.D. Va. 1996). Whenever it appears, by suggestion of the parties or otherwise, that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. Fed. R. Civ. P. 12(h)(3).

### B. <u>Motion to Dismiss, Fed.R.Civ.P. 12(b)(6)</u>

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations.  <u>Advanced Health-Care Services, Inc., v. Radford Community Hosp.</u>, 910 F.2d 139, 143 (4th Cir. 1990).  Moreover, dismissal for failure to state a claim is

properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint.  Conley v. Gibson, 355 U.S. 41, 45 - 46 (1957).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

**C.  Motion for Summary Judgment**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.  Celotex at 323.  Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts."  Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The nonmoving party must present specific facts showing the existence of a genuine issue for trial.  Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing

that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. <u>Id.</u> at 248. Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." <u>Matsushita</u>, at 587 (citation omitted).

Plaintiff is proceeding *pro se* and therefore, the Court is required to liberally construe his pleadings. <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972) (*per curiam*); <u>Loe v. Armistead</u>, 582 F.2d 1291 (4th Cir. 1978); <u>Gordon v. Leake</u>, 574 Fed 2nd 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. <u>Haines</u>, 404 U.S. at 520 – 21.

The mandated liberal construction means only that of the court can reasonably read the pleadings to state a valid claim on which Plaintiff could prevail, it should do so. <u>Barnett v. Hargett</u>, 174 Fed 3rd 1128 (10th Cir. 1999). However, a court may not construct plaintiff's legal arguments for him. <u>Small v. Endicott</u>, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." <u>Beaudett v. City of Hampton</u>, 775 F.2d 1274 (4th Cir. 1985).

### III. <u>Analysis</u>

### A. <u>FTCA Tort Complaint</u>

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of the negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. <u>Dalehite v. United States</u>, 346 U.S. 15, 30-31 (1953).

The provision of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) and 2671-2680.

The Supreme Court has held that "a person can sue under the Federal Tort Claims Act to recover damages from the United States Government for personal injuries sustained during confinement in a federal prison, by reason of the negligence of a government employee." United States v. Muniz, 374 U.S. 150 (1963). However, the FTCA does not create a new cause of action. Edina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). "The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Id.

However, there is no prejudgment interest and no punitive damages awarded in a FTCA action.  See 28 U.S.C. § 2674, which provides as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, **but shall not be liable for interest prior to judgment or for punitive damages.**

28 U.S.C. § 2674 (emphasis added).

## B. **Medical Negligence Claims**

To establish a medical negligence claim in West Virginia, the plaintiff must prove:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate

16

cause of the plaintiff's injuries, expert testimony is required.  <u>Banfi v. American Hospital for Rehabilitation</u>, 529 S.E.2d 600, 605-606 (W.Va. 2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued.  W.Va. Code §55-7B-6. This section provides in pertinent part:

> **§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions**
>
> (a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.
>
> (b) *At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim* on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, *together with a screening certificate of merit*. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

W.Va. Code §55-7B-6 (emphasis added).

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See <u>Stanley v. United States</u>, 321 F.Supp.2d 805, 806-807 (N.D. W.Va. 2004).[4]

---

[4] In <u>Stanley</u>, the plaintiff brought suit against the United States alleging that the United States, acting through its employee healthcare providers, was negligent and deviated from the "standards of medical care," causing him injury.

Here, with regard to the appropriate standard of care, the plaintiff has completely failed to sustain her burden of proof.  Plaintiff has not even attempted to assert, much less establish, the standard of care for the diagnosis or treatment of vaginal prolapse; hemorrhoids; failure to provide appropriate pre- or post-operative care; failure to refer her to the appropriate surgeon(s) to treat her problems; failure to timely provide endocrinology treatment for her hyperthyroidism; and/or the generally delayed treatment for all of her medical problems.[5]  It is apparent from the record that from April 15, 2016 through January 15, 2019, the HSFF medical staff evaluated and provided treatment for Plaintiff's many medical and surgical issues.

The undersigned agrees with the United States that Plaintiff's medical and surgical problems are complex medical issues which requires that a screening certificate of merit be filed. In Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D. W.Va. 2005), the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of the MPLA permitting the filing of a claim without submitting a certificate of merit. Id. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and infection." Id. at 858 (all spelling and punctuation errors in original).[6]

---

[5] Plaintiff offers no pleadings, affidavits, or declarations from any medical professional that establishes the applicable community standards for the diagnosis or treatment of any of her problems.

[6] Johnson is a rare exception to "the general rule that in medical practice cases negligence or want of professional skill can be proved only by expert witnesses." See Banfi v. Am. Hosp. for Rehab., 529 S.E.2d 600, 605 (W.Va. 2000). A court shall require expert testimony except where the "lack of care or want of skill is so gross, so as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience…" Id. at 605-606.

Unlike the facts in <u>Johnson</u>, Plaintiff's allegations of medical negligence are complex and expert testimony is necessary. <u>See O'Neil v. United States</u>, 2008 WL 906470 (S.D. W.Va. Mar. 31, 2008)(finding that plaintiff was not excused from filing a screening certificate of merit because the treatment and diagnosis of Graves disease, hyperthyroidism, congestive heart failure, and cardiomyopathy are not within the understanding of lay jurors by resort to common knowledge and experience); <u>see also</u> <u>Lancaster v. Hazelton</u>, 2018 U.S. App. LEXIS 20836, *1 (4th Cir. Jul. 26, 2018) (*per curiam*) (affirming this court's dismissal of his FTCA medical negligence claims for his failure to file the required screening certificate of merit, pursuant to W. Va. Code § 55-7B-6(b) prior to filing his medical negligence claim).

Expert testimony is necessary to support any finding that the medical treatment provided by the staff at HSFF fell below the applicable standard of care. The undersigned finds that the symptoms, methods of prevention, and proper treatment options for Plaintiff's many medical and surgical issues are not within the understanding of lay jurors by resort to common knowledge and experience. Further, neither is the alleged causal connection in the delay of the testing and the injuries alleged. Accordingly, Plaintiff is not excused from filing a screening certificate of merit pursuant to West Virginia Code § 55–7B–6(c) and her FTCA medical negligence claim against the United States' employees should be dismissed for failure to state a claim upon which relief can be granted. Summary judgment should be granted to the Defendant.

## IV. <u>Recommendation</u>

For the foregoing reasons, the undersigned hereby recommends that the Defendant's Motion to Dismiss or for Summary Judgment [ECF No. 94] be **GRANTED**, and that Plaintiff's Second Amended FTCA Complaint [ECF No. 20] be **DISMISSED with prejudice**. Further, the

undersigned recommends that the plaintiff's pending Motion for Reconsideration of Order of Dismissal [ECF No. 67] be **DENIED as moot.**

The parties are notified that this Report and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas S. Kleeh, United States District Judge.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), Rules 6(d) and 72(b), Federal Rules of Civil Procedure, and Rules 1(b) and 8(b) of the Rules Governing Proceedings in the United States District Courts Under Section 2254 of Title 28, United States Code, **any party shall have fourteen days (filing of objections) and then three days (mailing/service), from the date of filing this Report and Recommendation within which to file with the Clerk of this Court**, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.**  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12. Extension of this time period may be granted by the presiding District Judge for good cause shown.

**Failure to file written objections as set forth above shall constitute a waiver of** ***de novo*** **review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).  A copy of such objections shall be served on Judge Kleeh.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Petitioner by certified mail, return receipt requested, to his last known address as reflected on the docket sheet, and to transmit a copy electronically to all counsel of record.

Finally, because this Report and Recommendation completes the referral from the District

Court, the Clerk is **DIRECTED** to terminate the Magistrate Judge association with this case.

DATE: January 5, 2021

/s/ *Michael John Aloi*

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE